Argued February 4, reversed February 24, 1965

WINKLEMAN ET AL v. OREGON-WASHINGTON
PLYWOOD COMPANY
399 P. 2d 402

*Gerson F. Goldsmith,* Portland, argued the cause for appellants. With him on the brief were Goldsmith, Siegel & Goldsmith, Portland.

*Fredric A. Yerke, Jr.,* Portland, argued the cause for respondent. With him on the brief were King, Miller, Anderson, Nash & Yerke, Portland.

Before SLOAN, Presiding Justice, and GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

HOLMAN, J.

Plaintiffs are the adminstratrix and heirs of Isidore Winkleman, deceased. Defendant corporation was the owner of a mill town, saw mill, and equipment at

Bradwood on the lower Columbia River. Defendant terminated the operation of its mill in January 1963 and put its entire assets at Bradwood up for sale. On April 17, 1963, Winkleman entered into a written contract with defendant to purchase from defendant its entire assets at Bradwood for the sum of $235,000 of which $10,000 was to be paid upon the making of the agreement, $13,500 on or before April 22, and the balance of $211,500 on or before May 15. The agreement had a provision that time was of the essence and in the event Winkleman failed to make the payments when due, defendant could retain any payments theretofore made as liquidated damages, as the parties agreed the damages would be difficult to ascertain.

Winkleman made the first two payments for a total of $23,500. On May 15, the day for the completion of the contract, Winkleman met with Mr. Sachs, an officer of the defendant corporation who was authorized to speak for it. At the meeting Winkleman told Sachs he did not have the money to complete the purchase and asked for an extension of time in which to raise the money required. Time was extended from May 15 to May 21, Winkleman paying defendant $1,500 for the extension as this was the estimated expense to defendant because of caretakers, insurance, etc. Sachs also told him if he could raise another $26,500 so he would have a deposit of $50,000 they could work out another type of contract.

During the period of the extension Winkleman informed Sachs that he could not raise the money or increase his deposit, and they discussed another agreement. As a result, by the end of the week they entered into a second written agreement drawn by Sachs, who

was a nonpracticing attorney, covering only the real property and which provided in part as follows:

"This is to confirm our agreement with you of even date herewith, relative to the properties hereinabove captioned:

1. At your request we are:
   A. Hereby canceling our agreement with you dated April 17, 1963,
   B. Applying your $23,500 and $1500 deposits heretofore made with us as follows:
      (1) $5000 in reimbursement of our expenses and in settlement of our damages in connection with your not going through under the April 17th contract as you agreed,
      (2) $20,000 as a deposit on your purchase from us under the terms hereinafter contained of the real estate (land and buildings) at Bradwood, for a total of $120,000, payable to us in the manner hereinafter provided.

By the terms hereof, you will have no further interest in or responsibility with respect to the machinery, equipment, supplies, and personal property at the said plant for the purchase whereof you were heretofore negotiating.

"We now agree to sell to you and you agree to purchase from us all of the said real estate for the total sum of $120,000, payable to us $20,000 by the application of a portion of your deposit hereinbefore mentioned, and $100,000 by your promissory note payable two years from May 15, 1963, secured by an Oregon deed of trust upon all the said property, and payable with interest at 6% per annum. You will undertake in the said trust deed and in the said note to make quarterly payments to us for the amount of interest due and for one-fourth of all real estate taxes to become due upon the said property annually after May 15, 1963. You will also undertake, at your own cost, to keep the said

buildings and structures insured for fire and extended coverage with an insurance company acceptable to us and in an amount of not less than $100,000, with a loss payable clause in said insurance policy in favor of Oregon-Washington Plywood Company, as mortgagee.

"We reserve the right and option at our election on or before July 15, 1963 to return your said $20,000 deposit to you and thereby to cancel our within agreement with you for the sale of the said real estate as aforesaid. However, should we elect not to return such deposit to you, this real estate sale and purchase agreement between us shall remain in full force and effect, and we shall then execute to you a warranty deed on said property, and you will concurrently execute to us your $100,000 note and deed of trust. * * *"

Before entering into the contract Winkleman assured Sachs he would be able to make the quarterly payments of taxes and interest and complete the contract.

Winkleman died on June 17 prior to the date for performance of the second contract which was July 15. His estate was insolvent. Defendant sold the personal property, including the mill machinery, which had been covered by the first contract, at auction on June 25. Winkleman's administratrix offered, on behalf of his estate, to complete the second agreement covering the real property, and the defendant refused. Defendant sold the real property on December 1 to a third party. At no time was Winkleman or the representatives of his estate ever in possession of any of the real property.

Plaintiffs brought suit to rescind the second contract and for the return of the $20,000 down payment, contending defendant refused to complete the contract.

Defendant defended on the following grounds: (1) plaintiffs did not and could not comply with the agreement because Winkleman's estate was insolvent and the administratrix did not have the authority to proceed, (2) the agreement of May 20 was discharged by Winkleman's death because of impossibility of performance and this resulted in the reinstatement of the contract of April 17 under which defendant was entitled to retain the $20,000 as liquidated damages. Defendant counterclaimed for approximately $57,000 damages for fraud caused by its reliance on the statements of Winkleman that he was willing and able to complete the second contract and make the payments therein provided.

The trial court held that plaintiffs were not entitled to relief, that defendant was not entitled to recover on its counterclaim for fraud, and that defendant was entitled to keep the $20,000 as liquidated damages under the first contract of April 17. Plaintiffs appeal.

■ The first step in determining the rights of the parties is to decide whether the second contract, dated May 20, was a substituted contract which acted as an immediate discharge of the first contract, dated April 17, or whether it was an executory accord which would extinguish the rights under the prior contract only upon its performance. 6 Corbin on Contracts, § 1293, page 190, states as follows:

> "It is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge, or is an accord executory the performance of which it is agreed shall operate as a future discharge. It is wholly a question of intention, to be determined by the usual processes of interpretation, implication, and construction. * * *"

The second contract stated:

"At your request we are:

A. *Hereby canceling our agreement with you dated April 17, 1963,*

B. *Applying* your $23,500 and $1500 deposits heretofore made with us as follows:

(1) *$5000 in reimbursement of our expenses and in settlement of our damages in connection with your not going through under the April 17th contract as you agreed,* * * *"* (emphasis supplied)

It is difficult to envision language which more plainly expresses an intent to make a substituted contract completely replacing the prior one. It not only states the defendant is canceling the first contract but provides for payment of the damages for the first contract's breach by Winkleman. We believe it was the intent of the parties to terminate completely the rights under the first contract upon the signing of the second. For a discussion of the law relative to substituted contracts see the opinion of Mr. Justice SLOAN in *Ohlson v. Steinhauser,* 218 Or 532, 538, 346 P2d 87.

■ Defendant contends, however, that the second contract was entered into by it because of its reliance upon the fraudulent statements of Winkleman that he would be able to complete the contract when he knew he did not have the funds to do so. In the same section of Corbin on Contracts previously cited, at page 196, there is the following language:

"* * * the substituted contract may itself be voidable for fraud, infancy, or other reasons; and if the power of avoidance is exercised, the avoided contract is nullified both as an executory contract and as a discharge. The prior claim then becomes again enforceable."

Winkleman had not been able to raise the money to complete the first agreement on the due date, nor could he raise even as much as $26,500 during the extension granted him. He was having repeated trouble raising money and defendant knew it and cannot now say it relied on his financial ability. Sachs' testimony concerning his conversation with Winkleman prior to the second contract was as follows:

"* * * so I said, 'All right, I'll work something out on paper and send you a memorandum of this deal, but I do want you to tell me now two things: First, whether you agree to pay if we go into this type of deal, whether you agree to pay taxes, and interest, and insurance, and other expenses on a quarterly basis so we don't get in deeper into this matter; and secondly, whether you are able to make such payments.' Well, he said, 'Mr. Sachs, I assure you that I have been in a lot of businesses, important matters, and there will be no trouble at all. You make this deal with me, and I will make the payments to you quarterly, and you will be satisfied,' * * *"

This hardly seems adequate testimony on which to base a claim of fraud. The trial court found it was insufficient and we agree. Even though Winkleman was insolvent, this does not necessarily mean, had he lived, that he could not have secured the funds to make the payments as they became due.

■ Plaintiffs and defendant differ on whether defendant was required to go through with the second contract after Winkleman's death leaving an insolvent estate. It is unnecessary for the Court to decide this question. If the plaintiffs are correct in their contention that defendant has breached the contract, plaintiffs are entitled to relief. If defendant is correct in its contention that it is not required to complete the

contract because Winkleman is dead and his estate is insolvent, it must nevertheless return the down payment. Had Winkleman lived, and defendant had not elected to return the $20,000 by July 15, defendant would have had to complete the transaction whether Winkleman was insolvent or not. Equity will not permit the defendant to be excused from performance by something beyond both parties' control, to wit, Winkleman's death, and at the same time permit it to keep the down payment.

■ Defendant adopts the position that plaintiff neither pleaded nor proved a case of equitable cognizance and therefore the trial court was correct in denying relief to plaintiffs. In effect, defendant contends that if plaintiffs' position is correct that defendant breached the contract, plaintiffs' remedy is at law for breach of contract; and if plaintiffs are entitled to the return of the down payment because of impossibility of performance caused by Winkleman's death, plaintiffs properly have an action for money had and received.

There is authority that a plaintiff, not in default, may bring a suit in equity to rescind an executory contract for the purchase of land and recover money paid on the purchase price where a vendor has breached a material part of the contract. *Walters v. Gotcher,* 187 Or 431, 435, 211 P2d 733; *Johnson v. Berns,* 111 Or 165, 174, 209 P 94, 224 P 624, 225 P 727. Also see cases collected at 134 ALR 1078. These authorities indicate plaintiffs stated a cause of suit. In any event, if this were not a correct statement of the law and plaintiffs' complaint did not plead a cause of equitable cognizance, defendant waived the defect by its failure to demur or otherwise object. *Helgeson v. Northwestern Trust Co.,* 103 Or 1, 8, 203 P 586; *Flaherty v. Book-*

*hultz,* 207 Or 462, 472, 291 P2d 221, 297 P2d 856; *Topolos v. Skotheim,* 126 Or 683, 693, 250 P 235, 270 P 753.

■ If plaintiff did not prove a case of equitable cognizance, it was waived by the defendant's failure, at the completion of plaintiffs' case in chief, to request that it be transferred to the law side of the court. *Ward v. Town Tavern,* 191 Or 1, 38, 228 P2d 216; *Topolos v. Skotheim,* supra. In submitting to the court, sitting in equity without a jury, the issues raised by plaintiffs' complaint and defendant's affirmative answers and counterclaim, all parties effectively waived any objection that the issues were legal and not equitable, *Dant & Russell v. Pierce,* 122 Or 337, 345, 255 P 603; *Ward v. Town Tavern,* supra.

The decree of the trial court is reversed and a judgment of $20,000 is entered in favor of plaintiff Rose Winkleman as administratrix of the estate of Isidore Winkleman, deceased, and against defendant with interest at 6 per cent from July 15, 1963, together with costs.