Argued and submitted October 19, 1988, affirmed March 22, Urban Planning's reconsideration denied May 12, C. M. Oregon Corp.'s reconsideration denied June 16, both petitions for review denied August 1, 1989 (308 Or 197)

JACKSON COUNTY FEDERAL
SAVINGS AND LOAN ASSOCIATION,
*Respondent,*

*v.*

URBAN PLANNING, INC., et al,
*Appellants,*

*and*

SPIERINGS et al,
*Defendants,*

*and*

ROGUE AGGREGATES, INC., et al,
*Intervenors,*

*and*

EKERSON QUALITY ROOFING CO.,
*Plaintiffs.*

(85-2216-NJ-1, 85-3719-NJ-1; CA A44429)

771 P2d 629

Robert H. Grant, Medford, argued the cause for appellants Urban Planning, Inc., and Alvin Zelver. With him on the briefs were Sandra Sawyer and Grant, Ferguson, Carter, P.C., Medford.

Frank R. Alley III, Medford, argued the cause for appellant C. M. Oregon Corporation. With him on the briefs was Heffernan, Fowler, Alley & McNair, Medford.

Douglas J. Richmond, Medford, argued the cause for respondent. With him on the brief were John Blackhurst and Kellington, Krack, Richmond & Blackhurst, Medford.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

This action was brought by Jackson County Federal Savings and Loan Association (JCF) to foreclose judicially two trust deeds on real property and a security interest in personal property executed by defendants Urban Planning, Inc. (UPI), Alvin Zelver and C. M. Oregon Corporation (CM) to secure a real property development loan. UPI and Zelver alleged as affirmative defenses and counterclaims that JCF breached the loan agreement by failing to disburse funds as required, that it tortiously breached an implied agreement to act in good faith in carrying out its obligation to pay out the proceeds of the loan and that it interfered with UPI's prospective economic relations. CM alleged that it was merely a surety and not a principal obligor with respect to the loan and that it was discharged by the misconduct of JCF that resulted in a material increase in CM's risk and impairment of its right to be indemnified by UPI and Zelver.

This case arises out of an effort by Zelver to design, construct and market Alder Creek, a residential retirement development in Medford. He acquired an option to purchase 196 acres for the development. He later assigned the option to UPI, the corporation that he formed to carry out the project. He then began to develop plans for the project, which was to include 935 residential units and 55 acres of common area. The project was to be marketed primarily in California.

CM agreed to invest in the project. UPI assigned to it the option to purchase the land. CM, in turn, was to purchase the land over a five-year period. UPI would then buy the land from CM as the lots were developed, at a price that was higher than what CM had paid and sufficient to provide CM with a percentage of any profit that UPI earned by developing and selling the property. The agreement was conditioned on UPI's finding an institutional lender to provide the bulk of the financing for the development of the project. CM agreed that it would pledge, as security for the development loan, portions of the land that it had acquired but not yet sold to UPI. CM also loaned UPI working capital of $1,056,000 to begin the project, to be repaid by UPI from revenues of sales of developed lots.

UPI contacted JCF for financing. On September 20, 1982, JCF agreed to loan UPI $1,125,000 to develop the first

18 lots, model homes and the entrance to the project. CM executed a trust deed to a portion of the property that it had acquired as security for that loan. JCF informally agreed that it would lend additional money when CM had acquired enough land to provide security for the increased loan. On September 30, 1983, JCF committed to make a second loan of $5,500,000 to UPI, to pay off the first loan and to finance the completion of Phases One, Two and Three of the project, which included the development of 131 lots, the common area and amenities to the point where the lots could be marketed. As security for the loan, CM executed another trust deed covering portions of its property that were to be developed. By that time, UPI had acquired 30 acres of the land from CM, and it also pledged that land as security. There is evidence from which it could be found that CM, UPI and JCF had an informal understanding that, if necessary, CM would later subject additional land to the deed of trust in order to secure additional funding.

Before the signing of the second loan agreement with JCF, UPI had paid "soft" costs, such as administrative and marketing expenses, out of the proceeds of the first loan from CM. At the time the second loan was made, UPI and Zelver estimated, and JCF believed, that the proceeds of the loan would exceed actual "hard" costs to complete construction. JCF agreed that it would fund soft costs out of that excess. The parties agree that the second loan contemplated the payment of soft costs out of the loan proceeds and that soft costs were part of the cost to complete construction.

The second loan agreement, which superseded the first, provides:

"7.4 Preconditions to construction disbursements: In advance of any construction disbursement on the project to be financed, in whole or in part, with proceeds of this loan, Borrower shall have delivered to Lender the following:

"* * * * *

"(c) A construction budget, approved by Lender. Included in such approval may be an allocation of the construction costs and soft costs between the proceeds of this loan which are available to Borrower and the funds, if any, that Borrower must supply from other sources, it being acknowledged that this loan may not be sufficient to provide the funds Borrower will require for the construction."

It also provides:

> "7.5.1(e) It is acknowledged by Borrower that the loan proceeds available to Borrower hereunder may not be sufficient to pay the total costs of the construction which will be outlined in the construction budget, and if so, the Borrower must supply the difference. Borrower must submit proof satisfactory to Lender that it has paid the difference, if any, between the construction payment then due and the loan proceeds then available for disbursement to Borrower."

Early in the project, Zelver associated Art Pufford, a CPA, as UPI's chief financial officer, to project expenditures and to develop accounting procedures. Pufford also established cash flow procedures for the administration of the loan and gave JCF and CM regular and frequent reports on the progress of the development. At the beginning of 1984, Pufford projected that, exclusive of sales revenues, UPI could complete all three phases of the project and still have $750,000 in the loan-in-process account to apply toward soft costs.

The development projections were based on the assumption that UPI would sell 50 homes in 1984 and 75 homes in 1985. The winter of 1983-84 was wet, and construction did not begin on the project until June, 1984. The amenities that were required to be completed in order to market the project in California were delayed. Zelver became aware of a possible cash shortage as a result of the delayed construction, which had led him to conclude that there would be few, if any, sales in 1984. He notified JCF that UPI had no additional funds to invest in the project and suggested that additional funding or an adjustment in the plans might be necessary. UPI called a meeting with JCF in July, 1984, at which time they discussed several options, including the loan of additional funds to be secured by additional land owned by CM and the construction of 10 foundations to be funded by a separate loan so that construction could continue during the fall rainy season of 1984. JCF rejected both ideas. It requested that UPI submit a new budget, marketing plan and cash flow analysis. In response, Pufford submitted documents projecting that, exclusive of sales revenues, UPI would need $1,900,000 in excess of the loan balance to pay costs related to the first three phases of the project. He also submitted a cash flow analysis based on a projection of 60 sales in 1985, which,

he testified, indicated that $1,900,000 would be made up in sales revenues.

JCF had paid to itself all previous interest payments from the loan-in-process account. It did so again in September, 1984. At or about the same time, JCF began meeting with CM in an effort to persuade it to provide additional funds for the project.

In early January, 1985, UPI and JCF met for a day and a half to discuss the problems with the project. The focus of the discussion concerned the treatment of "set asides," that is, funds that JCF had agreed with the city that it would disburse only for specific improvements or hold for cost overruns on specific items. By agreement with the city, the overrun allowances, which totalled approximately $291,000, could not be released until the particular phase of the project to which the allowances related had been completed and JCF had provided the city with a maintenance bond in the amount of the budgeted allowance. Pufford insisted, in any event, that the overrun allowances not be viewed in cost projections as part of the actual cost to complete the project, because they were set aside merely as a cushion and did not reflect estimates of actual costs. JCF rejected that suggestion and insisted that the overrun allowances continue to be considered as a part of the cost to complete the project.

On January 14, 1985, JCF wrote to Zelver that it would no longer pay cost overruns, interest, salaries and general administrative expenses out of the loan proceeds and that UPI would have to pay existing cost overruns of $16,545.19. In March, 1985, JCF obtained a release from the city of landscaping funds that had been set aside inappropriately. It did not advise UPI of that fact, however, because it still projected a large shortfall, considering interest and soft costs. Because it was unable to pay interest and soft costs, UPI concluded that it was unable to continue the project and notified JCF of its intention to suspend operations. JCF, through its president, requested that construction continue, because the loan was not then technically in default. UPI obliged and continued construction until May, 1985. On June 21, 1985, JCF declared the loan in default by reason of nonpayment of interest. It initiated this foreclosure proceeding three days later and obtained an order appointing a receiver.

After seven days of trial to a jury, during which both parties made their record, the court directed verdicts against UPI and Zelver on their affirmative defenses and counterclaims of interference with prospective economic relations and breach of good faith, and against CM on its affirmative defense asserting its discharge as surety because of the alleged increased risk. Then, apparently having concluded that it, and not the jury, should decide the remaining issues, it found that JCF was entitled to demand that Zelver provide additional funds as a condition of JCF's continued funding of the project, that UPI was in default for not providing those funds and that, therefore, there had been no breach of the loan agreement by JCF and no damage to CM's right of indemnity, assuming that it was a surety. The court entered a judgment foreclosing the interests of CM, UPI and Zelver in the real and personal property securing the loan.

 We consider first Zelver's and UPI's claim that they were entitled to a jury trial on the breach of contract affirmative defense and counterclaim. Although Oregon has abolished procedural distinctions between law and equity, ORCP 2, the distinction remains with respect to the right to a jury trial. Or Const, Art VII, § 3. Actions that, historically, were equitable in nature, including foreclosure suits, continue to be tried to the court. *Phillips v. Johnson,* 266 Or 544, 514 P2d 1337 (1973); *Harper v. Interstate Brewery Co.,* 168 Or 26, 120 P2d 757 (1942). The complaint fixes the nature of the action, and the court, sitting in equity, has jurisdiction to resolve all issues in the case, both equitable and legal, including legal defenses and counterclaims. *See Ruby v. West Coast Lbr. Co.,* 139 Or 388, 10 P2d 358 (1932); *see also Paddock v. L. W. Hembree Company,* 93 Or App 593, 763 P2d 411 (1988). However, a party who desires a jury trial on a legal defense or counterclaim brought in an equitable proceeding is entitled to one, unless the right is waived by the party's failure to assert it. *See Rexnord Inc. v. Ferris,* 294 Or 392, 657 P2d 673 (1983); *Winkleman v. Ore-Wash. Plywood Co.,* 240 Or 1, 399 P2d 402 (1965). Here, defendants sought a jury trial on their legal defenses and counterclaims at the outset of the case. The jury was impanelled and heard the evidence, but it was not permitted to decide the breach of contract claim. Defendants were entitled to have the jury decide the breach of contract claim if

there were factual issues to be resolved. They were not, if the only question was one of contract interpretation.

■ Defendants contend that JCF breached the agreement in three respects. The first two contentions involve an interpretation of the contract, which is a question of law for the court. Defendants argue that the loan agreement required the payment of interest from the loan-in-process account so long as there was money in that account, that JCF had no "discretion" in that regard and that, in refusing to pay interest, JCF breached the agreement. JCF argues, and we agree, that the loan agreement does not contain such requirements. The contract provides, in part:

"7.2 * * * (a) There shall be created and held by Lender an account entitled loan in process (LIP). It is from this account that disbursements will be made under the procedure as set forth in the Loan Agreement. The interest due under the promissory note will be billed semi-annually and shall be paid within ten (10) working days following the due date of each semi-annual period.

"7.3 * * * The proceeds of this loan available to Borrower shall, so long as the Borrower is not in default hereunder and on the conditions and procedure hereafter set forth be disbursed by Lender as follows:

"* * * * *

"(b) The interest due and payable to Lender to the extent there are sufficient amounts available therefor in the interest account.

"* * * * *

"9.1(j) * * * If the Lender at any time reasonably determines * * * that the cost of construction will exceed those costs and projections estimated by Borrower in the construction budget provided to Lender, or that the undistributed proceeds of the loan which are available for construction together with the portion of such costs which Borrower *had proposed in the construction budget to pay from other sources* shall be less than the amount necessary to pay for all work done or to be done and all other expenses for completion of the construction, then in such event, * * * Borrower will, within ten (10) days after written request by the Lender, deposit such of its own funds * * * with Lender as Lender deems necessary." (Emphasis supplied.)

Despite the reference in paragraph 7.3(b) to an "interest

account," the undisputed evidence is that the parties intended to delete that reference, that they never intended that there be an interest account, that there was none and that JCF consistently paid interest out of the loan-in-process account.

Paragraphs 7.2 and 7.3, when read together, provide that the loan proceeds are available for payment of interest "so long as the Borrower is not in default * * * and on the conditions and procedures" set forth in the loan agreement. Those conditions include the provisions of paragraph 9.1(j), which gave JCF the right to require that UPI provide its own funds if JCF "reasonably determines" that there were insufficient funds in the loan-in-process account "to pay for all work done or to be done and all other expenses for completion of the construction." After JCF had made that determination and had made the request of UPI, UPI's failure to provide its own funds would constitute a breach of the agreement, authorizing JCF to declare the loan in default. In that event, JCF would not be obliged to pay interest out of the loan-in-process account, even if there were funds remaining in it.

■ Defendants draw a distinction between the hard costs of construction and soft costs, which are all other costs to complete the project, such as professional services, general and administrative costs and marketing. Pufford testified that there were sufficient funds in the loan balance to pay hard costs to complete construction through Phase Three, but that the project needed an additional source of funds to pay the soft costs. Defendants appear to argue that paragraph 9.1(j) applies only if there are insufficient funds to pay the hard costs. That is not what the provision says. It permits the lender to require the borrower to deposit "its own funds" any time that the lender "reasonably determines" that funds available from undistributed proceeds of the loan and other sources are less than the amount necessary to pay for all work done or to be done and "all other expenses of completion of the construction," which would include soft costs. The uncontradicted evidence is that Phase Three of the project could not be completed without payment of the professional, general, marketing and administrative costs; those costs, therefore, must be treated as necessary for the completion of construction within the meaning of the contract. The loan proceeds were not sufficient to pay them. There is no jury question on that issue.

■ Defendants contend that the balance remaining in the loan-in-process account, together with proceeds of projected lot sales, would have been sufficient to permit the completion of the project. Therefore, they contend, JCF was not entitled to invoke paragraph 9.1(j). Although they do not contend that revenue from anticipated lot sales constituted an "other source," their argument is premised on an acceptance of their projection of revenue that they hoped to derive from the sale of lots in the first three phases, if and when they were completed and the lots were sold at a price that defendants hoped to receive. We do not believe that the loan agreement required JCF to accept that projected, uncertain source of funds as an "other source." The question was one of contract interpretation for the court, not a fact issue for the jury.

■ We conclude that, given our interpretation of the contract, which agrees implicitly with that of the trial court, there was no fact issue to be submitted to the jury. The only evidence was that the undistributed proceeds of the loan were less than the amount necessary to complete construction and that defendants did not have funds from other sources. On those facts, the loan agreement permitted JCF to require defendants to provide their own funds, failing which it could declare a default. JCF did not, as a matter of law, breach the contract by doing so.

■ Defendants' last contention in their breach of contract claim is that JCF breached its "implied covenant of good faith" under the agreement. They correctly state the rule that, in every contract, there is an implied covenant that the parties will act in good faith in the execution of the agreement. *Best v. U.S. National Bank,* 303 Or 557, 739 P2d 554 (1987). They argue that the following evidence supports a claim that JCF did not act in good faith: (1) The loan agreement required the payment of interest from the loan proceeds as long as there were sufficient funds in the loan balance. (2) JCF knew that UPI and Zelver had no funds with which to pay interest and "were at the mercy of JCF to distribute the funds from the loan." (3) The parties had informally agreed that UPI could pledge additional land for additional funds, and, in spite of that agreement, JCF would not consider making additional funds available. (4) One of JCF's loan officers, who became involved in the decision to require UPI to provide additional funds, testified that he did not like the project and that, after

it became apparent that UPI would need additional funds, JCF wanted CM, or someone else, to invest more money in it. With regard to the first point, we have already concluded that the loan agreement did not require the payment of interest from the loan-in-process account, simply because there were funds in the account. The other evidence, even if true, does not rise to the level of bad faith on the part of JCF in the exercise of its rights under paragraph 9.1(j). Accordingly, the evidence did not require submission of any aspect of the breach of contract claim to the jury.

Defendants claim that the trial court erred in directing verdicts on UPI's and Zelver's claims of "intentional breach of good faith" and tortious interference with economic relations. We agree with the trial court that, assuming that such claims are otherwise tenable in this kind of case, there is no evidence here to support them.

Finally, defendants assign as error the trial court's entry of a judgment of foreclosure of the trust deeds. Given our conclusions on their other assignments, there was no error in entering the judgment.

In its separate appeal, CM contends that it acted merely as a surety and that it was discharged from its obligation because of JCF's misconduct, which, it claims, increased its risk and impaired its right to indemnity.

UPI's agreement with CM required that CM pledge portions of its property to JCF to secure UPI's and Zelver's obligation to JCF. It also provided:

"Nothing in [this] agreement shall be construed to constitute CM or [Zelver] as a partner, joint venturer, agent, employe, or representative of the other. Each is an independent entity retaining complete control over and complete responsibility for its own operations and employes."

The trust deed securing JCF provides that CM executed it "for the sole purpose of subjecting the real property as collateral for the within identified loan, and it is not personally responsible for the payment of the promissory note or any deficiency." JCF has not asserted the right to a deficiency judgment against CM; the judgment only forecloses its interest in the land. We have no doubt that, if that were all there

was to it, CM would be a surety. *Chada v. Tapp,* 277 Or 3, 6, 558 P2d 1225 (1977); *Restatement of Securities* § 83 (1941).

However, there are many factors indicating that CM was more involved with UPI than would be a mere surety. CM's participation in the project was not limited to pledging its property to secure the loan to UPI. It was involved in an intricate plan to enable UPI to develop CM's land and then to purchase the land that it needed. The land that it provided as security would be developed as a result of, and be directly benefitted by, the loan that the land secured. CM provided the working capital for the initial planning of the development of the land that it had provided as security, to be repaid from profits earned on the project. It stood to gain significantly as the result of the loan by JCF to UPI and Zelver, a factor that JCF contends prevents CM from being treated as nothing more than a surety. *See* 72 CJS, "Principal and Surety" § 9.

■ Assuming, without deciding, however, that CM was a surety, its claims for discharge fail. A surety is discharged from its obligation if, without its consent, any modification of the contractual relationship between the principal and creditor materially increases its risk. *Lloyd Corporation v. O'Connor,* 258 Or 33, 36, 479 P2d 744 (1971); *Samuelson v. Promontory Investment Corp.,* 85 Or App 315, 317, 320, 736 P2d 207 (1987). A material change is one that a careful and prudent person undertaking a risk would regard as substantially increasing his chance of loss. *Fassett v. Deschutes Enterprises,* 69 Or App 426, 432, 686 P2d 1034, *rev den* 298 Or 150 (1984). CM contends that, although there were no express changes in the contractual relationship between JCF and UPI and Zelver, JCF's conduct throughout 1984 and 1985 created significant and material changes in the contractual relationship between CM and UPI and Zelver, the most significant change being the "groundless acceleration of UPI's debt." We have decided that JCF was entitled to do that under the loan agreement, and the acceleration did not therefore constitute a "change" in the contractual relationship.

Next, CM contends that JCF materially increased its risk by encouraging UPI and Zelver to continue construction after the loan was in default. The record shows, however, that the loan was not declared to be in default until after construction had ceased. Although it is true that construction continued beyond the March, 1985, interest due date, CM was

informed of, and was involved in, all negotiations leading up to the declaration of default. Furthermore, there is no evidence of the extent of the work done or whether it would constitute a material increase in risk.

CM also contends that it was discharged, because JCF failed to act in good faith to protect CM's surety interest when it paid out interest on the loan in September, 1984, after it was aware of the projections showing a potential shortfall. The record shows, however, that the actual cash flow projections were not made until after the interest had been paid. The record also shows that CM was involved in discussions concerning the status of the project and encouraged JCF in its efforts to solve the problems and did not object to JCF's continuing to fund the project through June, 1985. There is no evidence that JCF acted in bad faith in paying interest in September, 1984.

Finally, CM contends that it is discharged because of JCF's failure to protect the development after default and while the property was allegedly in JCF's possession, thereby impairing CM's right to recover any losses from UPI and Zelver. There is no evidence, however, that the property was in JCF's legal possession or control after the receiver was appointed or that any alleged deterioration of the value of the development was material. We conclude that, assuming it to be a surety, CM's duty in that capacity should not be discharged.

Affirmed.