Argued and submitted February 4, affirmed March 27, 2002

Gent WELSH,
William F. Schroeder, P.C.
and John T. Schroeder,
*Respondents,*

*v.*

Stanley W. CASE,
Wren Case, Lovene Case,
Wren Case and Lovene H. Case,
Trustees of the Wren W. and Lovene H. Case
Living Trust dated November 2, 1992,
*Appellants.*

98-12-39158; A112310

43 P3d 445

George W. Kelly argued the cause and filed the briefs for appellants.

Martin Leuenberger argued the cause for respondents. With him on the brief was Carol DeHaven Skerjanec.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

### SCHUMAN, J.

To pay for professional services rendered in a bank-ruptcy matter, defendants gave promissory notes secured by a mortgage to plaintiffs, who were their attorneys and a consultant. When defendants defaulted, plaintiffs brought this foreclosure action. Defendants assign error to the trial court's denial of their request for a jury trial and to the court's rejection of their defenses challenging the enforceability of the mortgage. We affirm.

On *de novo* review, we find the following facts. Defendants[1] own farm property in Union County. In the fall of 1989, after four years of losing money, they found themselves nearly $600,000 in arrears on a loan from the federal government administered through the Farm Credit Service (the federal creditor). They retained the firm of William Schroeder, P.C.,[2] and plaintiff Gent Welsh, a consultant, to help work out a debt restructure and avoid losing the farm. Negotiations did not succeed, and, in January 1990, the federal creditor sued to foreclose. Schroeder asked defendants for a fee deposit of $1,500 "to apply against cash advances by us and past and future time expended at our usual hourly rate." Defendants sent two checks, one for $500 to Welsh and one for $1,000 to Schroeder. When Schroeder tried to cash his check, the bank returned it due to insufficient funds.

Two months later, in March 1990, the federal creditor filed a motion for summary judgment in the foreclosure case. Schroeder informed defendants of this development, reminded them of the returned check, and asked for a payment of $3,500 to cover already-incurred expenses. He wrote, "Wheel[s] have now stopped turning to protect you further

---

[1] Defendants are three individuals (Stanley W. Case, Wren Case and Lovene Case) in their individual capacities, and two of them (Wren Case and Lovene Case) as trustees of a "Living Trust." Defendants argued at trial that they executed the mortgage at issue in this case as individuals, but that before they did so they had transferred the mortgaged property to the trust. The trial court rejected that argument and defendants do not assign error to that decision. Thus, in this opinion "defendants" are Stanley W. Case, Wren Case, and Lovene Case as individuals.

[2] Hereafter, "Schroeder" refers to plaintiff William Schroeder, P.C. References to "John Schroeder," also a plaintiff, are to an Idaho attorney whose firm, Schroeder & Lezamiz, associated with William Schroeder, P.C., in some aspects of this case.

and will not turn again until you have made a deposit of an additional $3,500." He also told defendants that they should "arrange a substantial fund" if they intended for him to apply for protection under the bankruptcy laws. Later that month, Schroeder again wrote defendants, informing them that they were delinquent in their payments and that he would formally withdraw as their lawyer if he did not receive payment by March 28. On that date, he received a check from them for $20,000, which he deposited in a trust account.

On May 7, 1990, the federal creditor won a judgment of foreclosure against defendants. As planned, Schroeder and his associated Idaho firm, Schroeder & Lezamiz, filed a petition in the United States Bankruptcy Court for the District of Idaho, seeking protection under Chapter 12 of the Bankruptcy Code, a since-repealed chapter entitled "Adjustment of Debts of a Family Farmer with Regular Annual Income." 11 USC § 1201 *et seq.* (2000) (terminated July 1, 2000). Along with the petition, plaintiffs filed a disclosure of compensation reporting the amounts already received by the attorneys ($8,120.53), as well as an attorney-client fee agreement setting out the hourly rates and specifying,

> "Client acknowledges that it has been informed by the Attorney that the reasonableness of the amount of the Attorney's compensation in any bankruptcy is subject to final review and approval by the United States Bankruptcy Court in accordance with 11 USC 330."

After extensive negotiation and litigation, including a change of venue to Portland and an initial rejection by the federal creditor, the bankruptcy court, on January 15, 1991, confirmed a debt restructuring plan. At the same time, the court approved fees for plaintiffs and entered orders to that effect.

Defendants had trouble meeting the terms of their Chapter 12 plan, and in addition they were unable to pay the court-ordered fees. Once again, they consulted plaintiffs. In late January of 1993, three relevant events occurred. First, plaintiffs negotiated on behalf of defendants a modified extension plan allowing them to avoid foreclosure by the federal creditor, a task that was complicated by the creditor's allegations that defendants had previously acted in bad faith

by misappropriating loan funds and selling assets out of the trust estate. Second, plaintiffs agreed to take promissory notes under which their fee payments were delayed until January 1, 1994 (Welsh), and January 1, 1995 (Schroeder, John Schroeder), by which time the bankruptcy plan would be completed, other creditors paid, and an order of discharge issued. Third, defendants mortgaged their farm to plaintiffs as security for the promissory notes. As a result of substituting the notes and mortgage for the court-ordered payments, plaintiffs' claim—approximately $22,000 plus interest at nine percent per year—was subordinated to the claims of other creditors, which amounted to approximately $700,000.

The parties do not agree regarding who first suggested the mortgage, nor do they agree whether it was actually signed before the modification was officially accepted. Defendants contend that plaintiffs coerced them into signing the mortgage by threatening to end the modification negotiations unless they did so. Plaintiffs argue that, by the time defendants signed the mortgage, they knew that the modification had been approved, so no coercion could have occurred. In support of their contention, plaintiffs note that the mortgage papers were re-signed, in the presence of a notary, several days after defendants knew the modification had been approved and that the notary testified that defendants signed willingly and with full knowledge of the papers' import. On *de novo* review, we find plaintiffs' version more credible: Regardless of who first suggested the idea of a mortgage to secure the promissory notes, defendants were not coerced into signing the mortgage papers. That conclusion comports with the trial court's rejection of defendants' counterclaims for duress and undue influence, to which defendants do not assign error.

On May 18, 1993, the bankruptcy trustee reported that defendants had made all of their payments under the modified plan. Three days later the bankruptcy court issued an order of discharge closing the case.

In August 1994, defendants filed a second Chapter 12 bankruptcy petition in which they included their debts to plaintiffs on the list of their existing obligations. That action was dismissed without an adjudication.

By late 1998, defendants had not paid their long-overdue promissory notes, and, on December 30, plaintiffs brought this action for foreclosure. Defendants responded with counterclaims and affirmative defenses. They also requested a jury trial. The trial court denied the jury trial request, rejected the affirmative defenses, and entered judgment of foreclosure. On appeal, defendants assign error to the denial of their jury trial request; the rejection of their argument that the mortgage is unenforceable because the debt it secures was discharged in bankruptcy; the rejection of their breach of fiduciary duty argument; and the rejection of their argument that plaintiffs should be denied relief because they have "unclean hands."

## I. JURY TRIAL

Defendants maintain that they had a right to a jury trial because their affirmative defenses were legal in nature. The trial court concluded that they were equitable and denied the request. That denial was not error.

*Jackson County Federal Savings v. Urban Planning*, 95 Or App 598, 605, 771 P2d 629, *rev den* 308 Or 197 (1989), sets out the principles governing this issue:

> "Although Oregon has abolished procedural distinctions between law and equity, ORCP 2, the distinction remains with respect to the right to a jury trial. Or Const, Art VII, § 3. Actions that, historically, were equitable in nature, including foreclosure suits, continue to be tried to the court. The complaint fixes the nature of the action, and the court, sitting in equity, has jurisdiction to resolve all issues in the case, both equitable and legal, including legal defenses and counterclaims. However, a party who desires a jury trial on a legal defense or counterclaim brought in an equitable proceeding is entitled to one, unless the right is waived by the party's failure to assert it." (Citations omitted.)

Defendants' amended answer raised affirmative defenses and counterclaims alleging duress and breach of fiduciary duties and seeking damages. Before trial, the court ordered those defenses stricken insofar as they would allow recovery of damages, but allowed them to remain in the answer by interlineation as "affirmative defenses by way of recoupment." Defendants do not assign error to that decision. Under

*Jackson County Federal Savings,* then, defendants had a right to a jury trial only if recoupment is a legal defense. It is not.

Recoupment "means the 'cutting back' of the plaintiff's claim by the defendant. Recoupment is confined to matters arising out of and connected with the transaction upon which the action is brought. 1 Bancroft, Code Pleading § 352." *Rogue River Management Co. v. Shaw,* 243 Or 54, 58-59, 411 P2d 440 (1966). The defense is more fully described at 20 Am Jur 2d 231, *Counterclaim, Recoupment and Setoff* § 5 (1995):

> "Recoupment * * * refers to the defendant's right, in the same action, to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract. * * * The practice serves to avoid needless delay and unnecessary litigation. As a defense, recoupment cannot be used to obtain affirmative relief. Recoupment applies only by way of reduction, mitigation, or abatement of damages claimed by the plaintiff and is not an independent action." (Citations omitted.)

One early legal historian notes that the function of recoupment is to "promote justice and prevent useless litigation." Thomas W. Waterman, *A Treatise on the Law of Set-off, Recoupment, and Counter Claim,* 481 n 31 (2nd ed 1872). A more contemporary scholar reports:

> "Recoupment originated as a limited equitable remedy allowing a defendant to mitigate or defeat a plaintiff's claim for damages * * *. Recoupment, like other equitable remedies, is regarded as a fairness doctrine * * *. It allows the court to examine the transaction as a whole and to determine whether the facts warrant the application of an equitable remedy." Camilla E. Watson, *Equitable Recoupment: Revisiting An Old And Inconsistent Remedy,* 65 Fordham L Rev 691, 713 (1996).

Although no Oregon court has had occasion to declare that recoupment is an equitable remedy, the Supreme Court has referred to it as "equitable recoupment," *Anderson v. Dept. of Rev.,* 313 Or 1, 3, 828 P2d 1001 (1992), and the Tax Court has adopted a statement that "[r]ecoupment exists in equity as well as at common law, and has been

said to be equitable in nature. It reduces the claim affirmatively urged so far as in reason and conscience it ought." *Allied Timber Co. v. Dept. of Rev.*, 8 OTR 428, 433 (1980) (quoting 20 Am Jur 2d 231 § 6). Other courts agree. *See, e.g., Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F3d 1392 (9th Cir 1994). Further, the Supreme Court treats set-off as an equitable defense, *Hartford Accident v. Pyle*, 271 Or 97, 530 P2d 843 (1975), and has explained that recoupment is identical to set-off except that the latter defense involves reducing the amount claimed in one transaction by an amount arising from an independent and unconnected transaction. *Rogue River Management Co.*, 243 Or at 59. Defendants direct us to no cases, treatises, or law review articles, nor have we found any, that characterize recoupment as a legal defense, nor do they present persuasive reasons why it should be so characterized. Agreeing with the authorities cited above, we therefore conclude that the proceeding is equitable and that the trial court did not err in denying defendants' request for a jury trial.

## II.   DISCHARGE

Defendants contend that the debt for attorney fees, nonpayment of which forms the basis for this foreclosure, was eliminated by the bankruptcy court's order of discharge. They base this argument on the reasoning in a Chapter 13 case, *In re Hanson*, 223 BR 775 (Bnkr D Or 1998). In that case, the attorney and his debtor client agreed before filing the petition that the client would pay $1,400 plus supplemental compensation as necessary. The attorney submitted the fee proposal to the court along with the petition, and at confirmation the court approved $1,400 plus $277.25 in supplemental fees. The client paid that amount. After discharge, the attorney then billed the client for an additional $238 for services "not billed through the court" for the purpose of "expedit[ing] the discharge of your case." The client and the United States trustee objected to that additional fee.

The court ruled in their favor, reasoning as follows: The court may award reasonable compensation to debtor's counsel for services rendered, 11 USC § 330(a), including (under the court's well-established practice) fees earned up until discharge. Such fees are "administrative expenses,"

11 USC § 503(b)(2). Administrative expenses are included in the plan and are to be paid by the trustee. 11 USC § 1328(a)(2). A Chapter 13 discharge discharges all debts provided for by the plan. 11 USC § 1328(a). Therefore a Chapter 13 discharge disposes of all attorney fees. The court also held that fees such as the extra $238 that were never submitted to or approved by the court are administrative expenses that are discharged. *Hanson,* 223 BR at 778.

Applying *Hanson* to their own situation, defendants note that the statute governing Chapter 13 discharges, 11 USC § 1328, has a nearly equivalent analog in Chapter 12, 11 USC § 1228. Both provide that "a discharge granted under * * * this section discharges the debtor from all unsecured debts provided for by the plan * * *." They then argue that the attorney fees in this case

> "should have been—but were not—treated as administrative expenses. Had they been so treated, they would have been paid under the defendants' chapter 12 plan. But plaintiffs chose not to treat them as they were supposed to be treated, and the result * * * is that they were discharged. There are no longer fees that require paying, and no basis for foreclosing a mortgage based on those fees."

In response, plaintiffs first note that the reason their fees were not treated as administrative expenses is that, as such, they would have had priority over debts to the federal creditor and defendants would not have been able to meet both payments; it was to enable defendants to meet the more pressing needs of this much larger federal creditor that plaintiffs allegedly "chose not to treat them as they were supposed to be treated," that is, chose to postpone their due date until after discharge and thereby subordinate them to the federal creditor. Indeed, the trial court expressly found (and we agree) that,

> "had Plaintiffs demanded payment on the priority [administrative] claim [for fees] rather than accepting the junior mortgage, Defendant[s] would not have been able to make payment under the Bankruptcy Plan. The Mortgage allowed payment on the priority claims to be postponed, clearly to Defendants'[ ] benefit."

Plaintiffs argue that, in fact, they did not fail to treat the fees "as they were supposed to be treated." They maintain that their fee agreement with defendants, executed before filing the petition for bankruptcy ("prepetition"), indicated that payment for services rendered after filing ("postpetition") would come from funds outside the plan, in particular from funds in possession of defendants after confirmation. Defendants were free to contract for payment from those funds because, under 11 USC § 1227(b), "the confirmation of a plan vests all of the estate in the debtor"; they are no longer in the bankruptcy estate. Thus, plaintiffs argue, the plan never included the debt underlying the promissory notes, and that debt was never discharged.

In support of their theory, plaintiffs cite *In re Hines*, 147 F3d 1185 (9th Cir 1998), a Chapter 7 case. The attorney in *Hines*, before filing the debtor-client's petition, took some of his fee in advance and the rest by way of promissory notes and predated checks to be cashed after the filing. Midway through the proceedings, the client fired the attorney and stopped payment on the checks. The attorney attempted to collect the portion of the fees owed him for the work he had done after filing, and the client filed a motion for contempt alleging willful violation of the automatic stay. Resolving the case required the court to determine whether

"[t]he postpetition rendition of legal services bargained for pursuant to a prefiling fee agreement entitles [the attorney] to recover the fees for those later services, not from the bankruptcy estate * * * but directly from [the debtor-client] herself." *Id*. at 1189.

After explaining that, under the current Bankruptcy Code, an attorney in a Chapter 7 case could never successfully ensure that he or she would be paid and that such a state of affairs threatened "a massive breakdown" of the system, the court held that the attorney could look to the debtor, not her estate, and that therefore

"[a]ll claims for lawyers' compensation stemming from * * * postpetition services actually provided to the debtor really do not fall within the * * * discharge provisions of [Chapter 7]." *Id*. at 1191.

*Accord In re Sanchez*, 241 F3d 1148, 1150-51 (9th Cir 2001) ("There is no question after *Hines* that a reasonable fee for post-petition services is not a dischargeable debt."); *In re Jastrem*, 253 F3d 438 (9th Cir 2000); *but see* Joshua D. Morse, *Public Policy Is Never A Substitute For Statutory Clarity: Rejecting The Notion That Pre-Petition Attorney-Fee Debts Are Nondischargeable In Chapter 7 Bankruptcies*, 40 Santa Clara L Rev 575, 593-96 (2000) (criticizing *Hines*). Plaintiffs maintain that the principle underlying *Hines*— that attorney fees for services rendered after filing the petition are not discharged—supports their position here. Under that principle, both the debt underlying the promissory notes and mortgage, as well as the notes and mortgage themselves, are not discharged.

We thus face a situation in which neither party cites, and we have not found, any case law or commentary addressing the question at hand: In a Chapter 12 bankruptcy, does an order of discharge eliminate a debt owed to the debtor's attorney for fees earned after filing? The parties agree that the question of attorney compensation implicates one of the glaring gaps in the Bankruptcy Code. Defendants argue that the fees are discharged and cite *Hanson,* a Chapter 13 case; plaintiffs argue that they are not and cite *Hines*, a Chapter 7 case. In deciding which position is the stronger, we must attempt to determine how the federal court would answer this question concerning an interpretation of federal law. *See Megdal v. Board of Dental Examiners*, 288 Or 293, 300, 605 P2d 273 (1980) (United States Supreme Court interpretation of Due Process Clause governs application of that clause in state court case). For the reasons that follow, we conclude that such a court would more likely adopt plaintiffs' position.

Defendants correctly point out that the textual similarity between the relevant sections of Chapters 12 and 13 is stronger than any similarity between Chapters 12 and 7. Nonetheless, defendants rely entirely on an interpretation of Chapter 13 from the District of Oregon Bankruptcy Court, whereas plaintiffs' position derives from a Ninth Circuit Court of Appeals decision. *Hanson,* defendants' case, has been followed in only one decision, from a Bankruptcy District Court in Indiana. *In re Randolph*, 2001 WL 1223139 (Bnkr ND Ind 2001). Plaintiffs' case, *Hines*, on the other

hand, is from the Ninth Circuit, where it is now the "unquestioned" law. *Sanchez*, 241 F3d at 1150-51.

More significantly, *Hines* demonstrates that the Ninth Circuit will react to a situation in which mechanical application of the text, in combination with longstanding but nontextual practices, leads to a result that is not harmonious with the overall objectives and smooth operation of the Bankruptcy Code, by fashioning a judicial remedy. In *Hines*, the court fashioned such a remedy in order to avoid a "massive breakdown." 147 F3d at 1191. Here, in the Chapter 12 context, it is true that no such disaster immediately looms, but this case does present a milder version of the kind of problem that the court solved in *Hines*: The *Hanson* rule, applied in this situation, would prevent debtors' attorneys from doing what plaintiffs did here, that is, from voluntarily subordinating their priority claim in order to enable the debtor to meet the plan's objectives. By providing a powerful disincentive to the solution plaintiffs found in this case, the *Hanson* rule would thereby frustrate one obvious objective of the Bankruptcy Code: permitting debtors to achieve a "fresh start." Observing the rule here, on the other hand, would serve no purpose whatsoever.

We therefore conclude that plaintiffs' claim for attorney fees were claims against the debtors, not against the estate. 11 USC § 1227. They were not discharged.

## III.    BREACH OF FIDUCIARY DUTY

■       Defendants next argue that plaintiffs violated DR 5-104(A) by entering into a business transaction with them (obtaining the promissory notes and mortgage) in which their interests differed, without advising defendants to consult another attorney, and that the appropriate remedy for the violation is to nullify the fruits of the transaction. DR 5-104(A) provides:

> "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

Conduct violating a disciplinary rule does not give rise to a private cause of action or a defense to a cause of action. *Bob Godfrey Pontiac v. Roloff*, 291 Or 318, 330, 630 P2d 840 (1981). However, the disciplinary rules may illuminate a court's inquiry into whether a breach of duty owed by a lawyer to a client has occurred. *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 142, 843 P2d 442 (1992). Disciplinary rules, together with statutes and common-law principles relating to fiduciary relationships, all help define the duty component of the fiduciary duty owed by a lawyer to a client. *Id.* at n 12. Accordingly, as defendants have structured their argument, they must establish not only that plaintiffs violated a disciplinary rule, but also, in addition, that plaintiffs' conduct constitutes a breach of a fiduciary duty owed by a lawyer to his or her client. They must also demonstrate that this remedy applies against Welsh, a non-lawyer. Because we conclude that no violation of the disciplinary rule occurred, we need not reach the subsequent questions.

■ The Supreme Court has explained that, under DR 5-104(A), the obligation to make full disclosure and obtain consent arises if: (1) a person with whom a lawyer has entered a business transaction was a client of the lawyer at the time of the transaction; (2) the attorney and the client have different interests in the transaction; and (3) the client expects the lawyer to exercise the lawyer's professional judgment in the transaction for the protection of the client. *In re Harrington*, 301 Or 18, 25, 718 P2d 725 (1985). Defendants cite no case, and we can find none, in which the "business transaction" at the core of this rule is the fee arrangement between the lawyer and the client. Rather, the cases apply the rule when a lawyer and a client have entered into a transaction that is unrelated substantively to the formation or structure of the lawyer-client relationship itself, for example when a lawyer arranges to borrow money from a client, *In re Drake*, 292 Or 704, 642 P2d 296 (1982), lend money to a client for a business venture, *In re Thorp*, 296 Or 666, 679 P2d 857 (1984), or receive a gift from a client, *Toomey v. Moore et ux*, 213 Or 422, 325 P2d 805 (1958). Although it is possible that the lawyer-client fee arrangement is a "business transaction" and the lawyer's interests in it differ from the client's, *see Schroeder*

*v. Schaefer*, 258 Or 444, 477 P2d 720 (1971) (conflict-of-interest canon applicable to lawyer-client fee contract), it is unlikely that in negotiating a fee payment the client expects that the attorney is using his or her judgment for the protection of the client. That inquiry calls for a case-by-case determination. *See In re Luebke*, 301 Or 321, 326-29, 722 P2d 1221 (1986).

Here, as we have explained, the notes provided significant benefits for defendants, enabling them to satisfy more threatening creditors and to comply with the terms of the plan. But no evidence in the record suggests that plaintiffs told defendants that the notes and mortgage were for defendants' benefit or that defendants believed that plaintiffs were using their professional judgment for the protection of defendants in the notes and mortgage transaction. During the entire course of the attorney-client relationship between plaintiffs and defendants, the issue of fee payment was adversarial and was recognized as such by all concerned. Defendants' first "payment" of fees to Schroeder was by a check that bounced; in response, Schroeder sent a letter demanding immediate payment to cover the attorneys' expenses, suggesting creation of a substantial fund to cover future fees for services and informing defendants that without that payment plaintiffs could not continue working for them. Three weeks later Schroeder sent another letter informing defendants, "You are delinquent in the payment of your account to this office. It must be paid in full before March 28 or we will cease to perform any work * * *." Shortly before execution of the mortgage, John Schroeder wrote defendants:

> "[W]e along with Gent Welsh *must* have a mortgage to secure our fees and costs. The only alternative to this is payment by cash and that does not look feasible at this time.
>
> "I do not enjoy writing a demanding letter like this, but this must be addressed quickly." (Emphasis in original.)

Defendants testified explicitly that they knew the purpose of the notes and mortgage was to give plaintiffs "some assurance that they [were] going to get paid" and because they "had to have some security." Indeed, defendants' affirmative defense alleging duress demonstrates that, whatever else

they believed when they signed the notes and mortgage, they did not believe they were signing documents that were drafted for the purposes of protecting them from their adversaries. It is true that defendants testified that they trusted Schroeder. Trusting him "is not the same, however, as expecting that he was going to exercise his professional judgment for [their] protection." *In re Luebke*, 301 Or at 327.

■ Further, the evidence clearly establishes that defendants were experienced participants in lending and mortgage transactions. Sophistication of clients is a relevant consideration in determining whether they expected lawyer in a business transaction with them to exercise judgment to protect their interest. *In re Thorpe*, 296 Or at 671. They had executed numerous mortgages in the past, including the one leading to the circumstances that caused them to hire plaintiffs in the first instance. We conclude that the mortgage did not involve a violation of DR 5-104(A). We therefore do not need to decide whether such a violation would amount *per se* to a breach of a fiduciary duty, nor whether it would result in nullifying the notes and mortgage. The trial court did not err in rejecting defendants' breach of fiduciary duty defense.

## IV. UNCLEAN HANDS

■ The Bankruptcy Code requires a debtor's attorney to "file with the court a statement of the compensation paid or agreed to be paid * * * for services rendered or to be rendered in contemplation of or in connection with the case by such attorney." 11 USC § 329. Further, Bankruptcy Rule 2016(b) provides: "A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed." And Bankruptcy Rule 2017(b) provides for review of fee payments for excessiveness "on motion by the debtor, the United States trustee, or on the court's own initiative * * *." Defendants assert that under these provisions, first, plaintiffs were obligated to report to the United States trustee and the court the substitution of the notes and mortgage for the agreed-upon fees because that substitution was an "agreement not previously disclosed"; second, because plaintiffs failed to do so, they deprived the court of the opportunity to disapprove the arrangement; and third, that failure gives plaintiffs "unclean

hands" and therefore defeats their equitable claim for foreclosure.

"Unclean hands" is an equitable doctrine under which the court, in order to protect its own integrity, will deny equitable relief to a party in a transaction if that party, relative to the same transaction, is "guilty of improper conduct no matter how improper the [other party's] behavior may have been." *Merimac Co. v. Portland Timber*, 259 Or 573, 580, 488 P2d 465 (1971). *See generally* Edward Fadeley, *The Clean-Hands Doctrine in Oregon*, 37 Or L Rev 160 (1958). Several limitations restrict application of the doctrine. First, "the misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim. Even equity does not require saintliness." *North Pacific Lumber Co. v. Oliver*, 286 Or 639, 651, 596 P2d 931 (1979). Examples of serious misconduct include crimes, fraud, disloyalty to an employer, and bad faith. *Id.* (citing cases). Second, a court will not invoke the maxim if doing so will work an injustice. *Taylor v. Grant*, 204 Or 10, 26, 279 P2d 479 (1955) (quoting 30 CJS 487, *Equity*, § 98). Third, the party in favor of whom the maxim is invoked must prove that he or she has suffered actual injury due to the alleged misconduct. *Martin v. Allbritton*, 124 Or App 345, 352, 862 P2d 569 (1993).

Under these well-settled precepts, we conclude that the unclean hands doctrine does not apply here.[3] The conduct on which defendants base this argument—plaintiffs' failure to notify the trustee and bankruptcy court of the notes and mortgage—was neither criminal, fraudulent, nor in bad faith. Experienced, knowledgeable and credible witnesses at trial disagreed over whether the sections of the Bankruptcy Code cited by defendants imposed on plaintiffs the reporting obligation that defendants claim. It is undisputed that plaintiffs did report, and did receive approval for, their hourly rates, and that the total amount of the notes excluding interest ($22,828) is nearly identical to the total amount ordered by the bankruptcy court ($21,781). Whether or not they were also required to report, postconfirmation and predischarge, that they had agreed to take secured promissory notes, due

---

[3] We note that the trial court found that *defendants*, not plaintiffs, came to court with unclean hands and therefore could not prevail on *their* equitable claims.

after discharge, for the same amounts, because that arrangement was an "agreement not previously disclosed," is a question that has not yet been decided in any cited cases, and we cannot say that plaintiffs' failure to report amounted to concealment or bad faith.

Further, defendants' only assertion of harm resulting from plaintiffs' failure to report is this: "[P]laintiffs concealed from the court a fee arrangement that the court could have, had it been given the opportunity, chosen not to approve." That is altogether too speculative. In effect, defendants claim that *if* plaintiffs had an obligation to report, and *if* they had reported, then the court *might have* decided that the new arrangement was "excessive." That arrangement, it must be remembered, allowed defendants to postpone their payment of fees until after all of their obligations to other creditors under the confirmed plan had been discharged. We are unwilling to presume that the court would have found such an arrangement "excessive." We also note that Bankruptcy Rule 2017(b), which provides the mechanism by which the court, had it known, could have called a hearing to determine whether the fees were excessive, also provides that the same hearing and inquiry can be triggered "on motion by the debtor." Thus, the harm, if there was any, was partially self-inflicted. We decline defendants' invitation to apply the unclean hands doctrine. Doing so would work injustice.

## V. CONCLUSION

Defendants had no right to a jury trial because their recoupment defenses sounded not in law but in equity. The order of discharge did not eliminate the debt defendants owed plaintiffs for attorney fees because it was a claim against the debtors outside of the bankruptcy estate. Plaintiffs did not violate DR 5-104(A) because defendants did not believe that the purpose of the mortgage was to protect them from their adversaries. And plaintiffs do not have "unclean hands" so as to prevent them from bringing their claim in equity.

Affirmed.