Argued and submitted August 8, reversed and remanded November 27, 2002

STATE OF OREGON,
for the use and benefit of
KEY WEST RETAINING SYSTEMS, INC.,
an Oregon corporation,
*Appellant,*

*v.*

HOLM II, INC.,
an Oregon corporation;
and United States Fidelity and Guaranty Company,
a Maryland corporation,
*Respondents.*

HOLM II, INC.,
an Oregon corporation;
and United States Fidelity and Guaranty Company,
a Maryland corporation,
*Third-Party Plaintiffs,*

*v.*

Harold HILFIKER
and William Hilfiker,
dba Hilfiker Retaining Walls,
*Third-Party Defendants.*

99CV 0145; A111705

59 P3d 1280

Wayne Mackeson argued the cause for appellant. With him on the briefs was Dennis M. Odman.

Joseph A. Yazbeck argued the cause for respondents. With him on the brief were Lance B. Erz and Yazbeck & Hanson, L.L.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

This action arises out of a contract to widen Highway 101 where it follows Brush Creek in the Humbug Mountain Canyon. Plaintiff Key West Retaining Systems, Inc. (Key West) was a subcontractor to Holm II, Inc. (Holm II), the general contractor. Key West brought this action when Holm II refused to pay the amount due under the subcontract. Holm II's answer alleged setoffs and counterclaims against Key West. The trial court ruled that Key West was entitled to payment on the subcontract but that Holm II was entitled to back charges for personnel and materials, as well as flagging charges and liquidated damages. The trial court determined that Holm II was the prevailing party and awarded it attorney fees and costs. Key West appeals.

Key West makes four assignments of error. First, it assigns error to the trial court's holding that an oral contract existed between the parties. The trial court reasoned that Marvin Wyatt, owner of Key West, and Dennis Holm, vice president of Holm II, had agreed to do whatever was necessary to get the job done and that Holm offered Holm II's materials and personnel to Key West at cost. Key West argues that the purported contract was not sufficiently definite and that Key West did not accept it. In the alternative, Key West argues that, to the extent that an oral contract was formed, it did not permit recovery of either the $11,000.00 in liquidated damages or the $33,265.98 in flagging charges.

Second, Key West assigns error to the trial court's rulings designating Holm II as the prevailing party and awarding it costs, disbursements, and attorney fees. Similarly, in its third assignment of error, Key West argues that the trial court erred in denying Key West's request that it be designated as the prevailing party and that it be awarded its costs, disbursements, and attorney fees. Finally, Key West assigns error to the trial court's ruling that it was entitled to prejudgment interest on the amount owed by Holm II to Key West beginning on May 25, 2000. Key West argues that it was entitled to prejudgment interest on that amount as of January 4, 1999, when Holm II first issued a check to Key West.

The contract to widen Highway 101 was awarded by the Oregon Department of Transportation (ODOT) to Holm II in early August 1998; work was expected to begin in early September 1998. The project was difficult, because on one side of the work site was a one-lane highway used for traffic, and on the other side was a creek that had been temporarily narrowed. Holm II and ODOT wanted to ensure that the project was finished before winter; thus, their contract provided that the operation of equipment in the active creek bed must cease on October 31, 1998. If the in-stream work was not completed by that time, Holm II would be liable to ODOT for liquidated damages. Additionally, while certain work was being done, the normally two-lane roadway would have only one operating lane and flagging to redirect traffic would be required. The contract had a provision that allowed for payment for flagging until November 7, 1998, but if the work was not finished to a point where the road could be opened by November 7, Holm II would have to pay the additional flagging costs.

Key West is a specialty contractor that does road work and has experience installing retaining walls. After the contract was awarded to Holm II, Key West submitted a bid and ultimately entered into a subcontract with Holm II to supply and install the retaining walls for the project.

On August 25, 1998, a preconstruction conference was held. Although Key West had not yet entered into an agreement with Holm II, Key West's employee Andrew Ferchland was present at the conference. At the preconstruction conference, a schedule was available to all attendees that indicated that the paving on the project was expected to be completed by October 31, 1998, and that all work under the contract was to be completed no later than November 15, 1998.

On September 1, 1998, Key West entered into a subcontract with Holm II to supply and install retaining walls for the project. Also in September 1998, Holm spoke with Jerry Voelker, an officer of Key West. Holm told Voelker that Holm II would help Key West however it could and that personnel and materials were available to Key West at a fair price.

The work got off to a slow start, in part because Key West did not pick up its retaining wall materials and deliver them to the job site. In fact, Holm II picked up and delivered the materials for Key West. Additionally, Key West was over-booked and had not inspected the job site before it bid on the subcontract. Although the materials were delivered to the work site on October 8, 1998, Key West did not begin work until 1:30 p.m. on October 12, 1998. After seeing the job site and realizing the type of project it was dealing with, Key West sent Holm II a letter indicating its intent to walk away from the project unless certain aspects of the project were modified.

Due to those difficulties and before work commenced, Holm met with Wyatt in early October. At that meeting, Holm and Wyatt agreed to do whatever was necessary to complete the project in a time-efficient manner. When asked about his meeting with Wyatt, Holm testified that he did not mention his earlier conversation with Voelker to Wyatt because he was afraid that Wyatt would back out of the subcontract. After Key West and Holm II began work, Holm II assisted Key West with both personnel and materials to ensure that the work was completed as efficiently as possible.

Although lighting was available to allow Key West and Holm II to work at night, Key West did not work in the evenings and usually left for the day while Holm II continued working. When asked about the hours his crew worked, Wyatt testified that he would not allow his crew to work more than 12 hours per day. Furthermore, Key West was not on the job every day.

Key West's understanding was that the in-stream work had to be completed by October 31, 1998, and Key West was finished with its duties and out of the stream bed by October 29, 1998. However, Holm II expected Key West to be finished with its work earlier because Holm II had other jobs, such as paving, that could not begin until the in-stream work was completed. Thus, when Key West left the job site, Holm II still had work to complete. The work was not completed on time, and Holm II was liable for 11 days of liquidated damages under its contract with ODOT. Holm II was also

assessed flagging charges from November 7 until approximately November 19.

On January 4, 1999, Holm II sent Key West a check for $113,712.30, but later stopped payment. On January 6, 1999, Holm II sent Key West a pay voucher in the amount of $24,533.82 that subtracted both the amount of the January 4 check and the back charges and offsets Holm II claimed it was owed. Key West then commenced this action, arguing that it was entitled to full payment under the subcontract. Holm II counterclaimed that it was entitled to back charges for personnel and materials and that Key West delayed the project so that Holm II was entitled to $11,000.00 in liquidated damages and $33,265.98 in flagging charges.

The case was tried to the court. The trial court concluded that, although Key West was entitled to the full amount owed to it under the subcontract, an oral contract existed between Key West and Holm II and, under the oral contract, Key West owed Holm II back charges for the personnel and materials provided by Holm II. The trial court also found that Key West caused delays in the project so that Holm II was entitled, under the subcontract, to reimbursement from Key West for any delay-related charges assessed to Holm II, including the liquidated damages and flagging fees.[1] In its "clarification for judgment" letter, the trial court noted that it found Holm II to be the prevailing party in the action, and, in its amended money judgment, the trial court accordingly awarded Holm II its attorney fees and costs pursuant to ORCP 68. Finally, the trial court denied Key West's request for prejudgment interest on the amount owed to it beginning January 4, 1999, when Holm II issued Key West its check.

Key West first assigns error to the trial court's ruling that an oral contract was formed during the meeting between Holm and Wyatt. Whether a contract existed is a question of law. We review the trial court's findings of fact for any evidence and its legal determinations for errors of law. *Illingworth v. Bushong*, 297 Or 675, 694, 688 P2d 379 (1984).

■ Key West argues that there was insufficient evidence to support the trial court's conclusion that an oral contract

---

[1] See Appendix A for a listing of amounts awarded.

existed. Key West claims that, during the meeting between Holm and Wyatt, back charges were not discussed and both Holm and Wyatt agreed that they would not enter into any change orders. Key West also argues that the discussions were not sufficiently definite to constitute an oral contract. We agree with the trial court that the parties entered into an oral contract that was separate from the written subcontract. Key West accepted the oral contract by agreeing with Holm II to do whatever was necessary to complete the contract. *See Gordon v. Curtis Bros. et al.*, 119 Or 55, 62-63, 248 P 158 (1926) ("Anything that amounts to a manifestation of a formed determination to accept the offer communicated to the party making such an offer would doubtless complete the contract.").

Based on the evidence, we conclude that the trial court did not err in finding that an oral contract existed between Key West and Holm II, whereby Holm II would supply Key West with materials and personnel at cost to ensure that Key West could perform its contractual obligations. Holm II is entitled to payment for the materials and personnel that it provided to Key West.

Key West next contends that the trial court erred in determining that Holm II was entitled to recoup liquidated damages and flagging charges under Article 6.5 of the written subcontract, which provides that Holm II could hold Key West liable for any damages due to delay beyond the completion date:

"If the Contract provides for liquidated or other damages for delay beyond the completion date set forth in the Contract, and are so assessed against CONTRACTOR, then CONTRACTOR may assess liquidated damages against SUBCONTRACTOR, either (1) in proportion to SUBCONTRACTOR's share of the responsibility for such delay, or (2) in the event of concurrent delays caused by SUBCONTRACTOR and CONTRACTOR, then liquidated damages shall be assessed against the SUBCONTRACTOR in the proportion that SUBCONTRACTOR's Subcontract price of the work bears to the total Contract price for CONTRACTOR's portion of the project."

Key West asserts that the record evidence did not support Holm II's recovery of delay-related damages pursuant to Article 6.5 or otherwise.

■ As a threshold matter, because the answer governs our standard of review, we must first determine whether Holm II's claim for recovery of delay-related expenses was legal or equitable in nature. If Holm II's recovery is properly characterized as a counterclaim, the relief would be legal, and we would review to determine if there was any evidence in the record to support the trial court's award, including the predicate determination that Key West's performance was actionably delayed. *See Waller v. Rocky Mtn. Fire & Casualty*, 272 Or 69, 72, 535 P2d 530 (1975). Conversely, if Holm II's claim was recoupment or setoff, the relief would be equitable, and our review would be *de novo. See Welsh v. Case*, 180 Or App 370, 376, 43 P3d 445, *rev den*, 334 Or 632 (2002). As described below, we conclude that, although Holm II's answer denominated its pleadings with respect to the alleged delay-related damages as a "setoff and counterclaim," the relief sought and awarded was actually, in substance, recoupment. Accordingly, we review *de novo.*

■ ■ " 'Recoupment,' 'setoff' and 'counterclaim' are not synonymous terms." *Rogue River Management Co. v. Shaw*, 243 Or 54, 58, 411 P2d 440 (1966). "Recoupment" is an equitable remedy that reduces, mitigates, or abates damages alleged by the plaintiff. *Welsh*, 180 Or App at 376. "Recoupment is confined to matters arising out of and connected with the transaction upon which the action is brought." *Rogue River Management Co.*, 243 Or at 58-59. "Setoff" is also an equitable defense. *Welsh*, 180 Or App at 377. Setoff is a "money demand by the defendant against the plaintiff arising upon contract and constituting a debt *independent of and unconnected with the cause of action* set forth in the complaint." *Rogue River Management Co.*, 243 Or at 59 (internal quotation marks omitted; emphasis in original). Finally, a "counterclaim" is different from both setoff and recoupment and "permits affirmative relief. * * * Recoupment and setoff may be available as defenses * * * in situations where an independent action would not lie." *Id.* at 60.

Here, defendant's answer denominated the attempt to recover delay-related damages pursuant to the subcontract as a "setoff and counterclaim." That denomination does not, however, control our review. Rather, we look to the actual substance of the relief sought. *Rexius Forest*

*By-Products v. A & R Lumber Sales*, 112 Or App 114, 117, 827 P2d 1359 (1992). Here, Holm II's self-styled "setoff and counterclaim" alleged that Key West was liable for payment of, *inter alia*, the delay-related expenses or "alternatively, to the extent [Holm II] is determined to be liable to [Key West] on its claims, [Holm II] is entitled to a setoff" for those amounts. As this case was ultimately resolved, the trial court determined that Holm II was, in fact, liable to Key West on Key West's contract claim. Given that result, only the alternative relief was implicated—that is, that Holm II is entitled to a setoff for the delay-related expenses. In other words, as framed by Holm II's pleadings, if Key West prevailed on its contractual claim, Holm II did *not* seek an independent judgment by way of counterclaim against Key West with respect to the delay-related damages. Rather, in that event, Holm II merely sought a setoff.

As explained above, however, "setoff" is inapposite in these circumstances. As noted, "setoff" applies only where recovery is based on a debt in an unconnected and independent transaction. *Rogue River Management Co.*, 243 Or at 59. Here, however, Holm II's alleged entitlement to recover for liquidated damages and flagging fees does not arise from some "unconnected" or "independent" transaction. Rather, any such entitlement arises out of the same transaction—the subcontract—which is the basis of Key West's claim. Consequently, in substance, Holm II obtained recoupment, not setoff.

■ On *de novo* review, we find that Key West did not impermissibly delay the project and, accordingly, cannot be liable under the subcontract for delay-related damages. Key West was responsible only for the in-stream work, which had to be completed by October 31, 1998. This is what Wyatt understood. Wyatt testified that no one from Holm II ever told him that Key West needed to be finished before October 31. Key West completed the job on time and left the work site on October 29, 1998.

At oral argument, Holm II argued that Key West delayed the project so that Holm II was not able to finish its work on time. However, Holm II knew that Key West needed assistance to complete the subcontract on time, and if that

left Holm II short of personnel necessary to complete its work, Holm II was obligated to obtain sufficient personnel. We hold that Holm II is not entitled to any damages, including liquidated damages and flagging fees, due to Key West's alleged delay of the project.

We thus hold that an oral contract existed between Key West and Holm II so that Holm II is entitled to back charges for the materials and personnel that it provided to Key West. Furthermore, we hold that the trial court erred in holding that Holm II was entitled to recoup liquidated damages and flagging fees under the subcontract due to the delay caused by Key West.

We proceed to Key West's second and third assignments of error, which challenge the trial court's designation of Holm II as the prevailing party, its award of costs and attorney fees to Holm II, and its denial of costs and fees to Key West. We agree with Key West that the court erred in each of those respects.

■ Key West prevailed in this action by obtaining a net recovery of $152,998.56 ($211,411.44 for breach of the subcontract, reduced by Holm II's recovery of $58,412.88 for "back charges" for loaned personnel and equipment under the parties' oral contract). While the subcontract under which Key West prevailed expressly provides an entitlement to attorney fees,[2] there is no evidence that the parties' oral contract under which Holm II prevailed conferred a similar entitlement. Thus, Key West is entitled to attorney fees and Holm II is not. *See generally Newell v. Weston*, 156 Or App 371, 965 P2d 1039 (1998), *rev den*, 329 Or 318 (1999). Finally, although Holm II made a pretrial offer to allow judgment in the amount of $127,500 pursuant to ORCP 54 E, Key West's net recovery exceeded that amount; thus, Holm II's offer to

---

[2] Article 11.3 of subcontract provides:

"Should either party employ an attorney to institute suit to enforce any of the provisions hereof, to protect its interest in any matter arising under this agreement, or to collect damages for the breach of the Subcontract or to recover on a surety bond given by a party under this Subcontract, *the prevailing party shall be entitled to recover reasonable attorney's fees, costs, charges, and expenses expended or incurred therein.*"

(Emphasis added.)

allow judgment did not preclude Key West's recovery of attorney fees. Accordingly, we reverse the trial court's designation of Holm II as the prevailing party, as well as the trial court's award of costs and fees to Holm II, and remand for the court to award Key West its reasonably incurred attorney fees and costs.

Finally, in its fourth assignment of error, Key West argues that the trial court erred in denying its request for prejudgment interest as of January 4, 1999, when Holm II first issued a check to Key West. Key West contends that "[t]he date from which the contract amount was due was ascertainable and there was at least some amount due when Key West completed its work."

Holm II argues that "[t]he general rule is that prejudgment interest will not be awarded where the amount owed is not liquidated, unless the damages are either ascertained or readily ascertainable and if the date from which prejudgment interest runs is also easily ascertained." Holm II further argues that, although it always conceded that it owed Key West some money, "Key West would not cooperate in helping Holm II make the determination of how much it owed, and to whom. * * * [T]he first time Holm II was able to ascertain how much it owed to Key West * * * was upon receiving the judge's letter ruling." Holm II relies on *Arden-Mayfair v. Patterson*, 46 Or App 849, 857, 613 P2d 1062, *rev den*, 290 Or 149 (1980), for the proposition that prejudgment interest is appropriate only where the exact pecuniary amount owed is easily discovered through simple computation, or by reference to generally recognized standards such as market price. In *Arden-Mayfair*, we held that prejudgment interest was not proper because the parties could not agree "upon the amount in dispute," *id*. at 858, and thus the "exact pecuniary amount owed by plaintiff," *id*. at 857, could not be "easily ascertained, or ascertainable, by simple computation," *id*. at 857-58.

*Arden-Mayfair*, however, is distinguishable. There, the plaintiff and the defendant disputed amounts owed under a business arrangement, under which the plaintiff, a dairy supplier, supplied products to the defendant who, in turn, delivered the products to the plaintiff's customers as

well as resold them for her own financial gain. *Id.* at 851. The defendant was billed for each individual product but was issued credits for products she delivered and for damaged products. *Id.* The transactions between the parties became extremely complicated and the parties hired an accountant to assist them in arriving at a balance of their account. *Id.* at 852. The accountant testified that she could not determine the exact state of the parties' account but explained that, from the parties' documentation, she found that the defendant was owed about $9,000. *Id.* at 853. The defendant, however, testified that she was owed $11,000, and the jury found for the defendant for still an entirely different sum. *Id.*

■ Here, unlike in *Arden-Mayfair*, the amount owed to Key West under the written subcontract, and the date upon which Key West was owed that amount, are easily ascertainable. Also unlike *Arden-Mayfair*, this case did not involve a series of complicated transactions.

Furthermore, after *Arden-Mayfair*, we have held that, although damages must be ascertainable at some point, even where damages are not ascertainable until after findings have been made by the trier of fact, "prejudgment interest is proper." *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 129 Or App 206, 218, 879 P2d 193 (1994), *aff'd in part, rev'd in part*, 325 Or 46, 932 P2d 1147 (1997). "Put another way, '[a]lthough there are questions of fact about the amounts owed, that does not mean that defendant did not owe sums certain at dates certain.'" *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 339, 39 P3d 903, *rev den*, 334 Or 190 (2002) (quoting *Hazelwood Water Dist. v. First Union Management*, 78 Or App 226, 231, 715 P2d 498 (1986)).

Here, Holm II acknowledges that it was able to ascertain how much it owed to Key West once the trial court made its findings of fact. Although we agree with Key West that the date on which the subcontract amount was due is ascertainable, we disagree as to when prejudgment interest should begin to run. We hold that the trial court should have awarded Key West its prejudgment interest as of January 6, 1999, because on that date Holm II sent Key West the pay voucher that subtracted the amounts that Holm II claimed it

was owed from the amount Holm II claimed it owed to Key West under the subcontract. Because Holm II attempted to ascertain the subcontract amount owed to Key West in the pay voucher, January 6 is an appropriate date to begin assessing prejudgment interest. The trial court thus erred in its determination that Key West was not entitled to prejudgment interest on its damages award under the written subcontract. We remand for the trial court to determine the amount of prejudgment interest owed to Key West.

In sum, the trial court correctly held that Key West was entitled to payment under the subcontract. The trial court also correctly held that the parties entered into an oral contract and that Holm II prevailed on that claim and was entitled to damages. However, on *de novo* review, we conclude, unlike the trial court, that Key West did not delay the project such that Holm II was entitled to liquidated damages and flagging fees. Thus, the trial court also erred in finding that Holm II was the prevailing party. Key West is the prevailing party and is entitled to its costs, disbursements, and attorney fees. Finally, Key West is entitled to prejudgment interest as of January 6, 1999.

Reversed and remanded.

## APPENDIX A

TRIAL COURT'S JUDGMENT

Key West's award under the subcontract ............$211,411.44

Holm II counterclaims

      a)   Back charges..............................- $ 58,412.88

      b)   Liquidated damages...................- $ 11,000.00

      c)   Flagging charges........................- $ 33,265.98

Net judgment to Key West...................................$108,732.58

TRIAL COURT'S SUPPLEMENTAL JUDGMENT

Attorney fees, costs and disbursements
    in favor of Holm II........................................- $ 38,883.15

Prejudgment interest in favor of Key West..........+ $ 4,879.42

Post-judgment interest in favor of Key West.......+ $ 3,270.82

Overall net judgment to Key West........................$ 77,999.67

COURT OF APPEALS' DAMAGE TABLE

Key West's award under the subcontract ............$211,411.44

Holm II oral contract award ................................$ 58,412.88

Key West's award (net) ......................................$152,998.56

Holm II's ORCP 54 E offer to allow judgment .....$127,500.00